# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THURMOND ALLEN JR.,** | : | |
| **Plaintiff** | : | **CIV. ACTION NO. 3:25-CV-106** |
| **v.** | : | **(JUDGE MANNION)** |
| **PENNSYLVANIA STATE POLICE CARLISLE TROOP H, _et al.,_** | : | |
| | : | |
| **Defendants** | : | |
| | : | |

## <u>MEMORANDUM</u>

This is a prisoner civil rights case filed pursuant to 42 U.S.C. §1983 in which plaintiff alleges civil rights violations arising from an alleged sexual assault and several other incidents. For the reasons set forth below, the complaint will be dismissed in part with prejudice, and the case will be allowed to proceed solely with respect to plaintiff's claims against defendant Voorstad.

# I.   BACKGROUND

Plaintiff, Thurmond Allen Jr., filed this case on December 31, 2024, and the court received and docketed her[1] complaint on January 17, 2025. (Doc. 1). Although no parties were initially served with the complaint, on March 28, 2025, counsel for defendant Wellpath LLC and other defendants employed by Wellpath entered an appearance and then filed a suggestion of bankruptcy and request for stay based on Wellpath's filing for bankruptcy protection in the United States Bankruptcy Court for the Southern District of Texas. (Doc. 19). On May 15, 2025, Wellpath informed the court that it had emerged from bankruptcy protection and that the automatic bankruptcy stay no longer applied to this case. (Doc. 20). Allen accordingly filed a motion to "proceed to the case" on August 1, 2025. (Doc. 22). The case is now before the court for a mandatory screening review pursuant to 28 U.S.C. §1915A(a) and 28 U.S.C. §1915(e)(2)(B)(ii).

---

[1] In an earlier case filed by plaintiff, the court referred to plaintiff by the masculine pronouns "he" and "him," which was in accordance with plaintiff's pronoun usage in that case. *See Allen v. Wellpath LLC*, No. 1:24-CV-1536, Docs. 37-38 (M.D. Pa. Aug. 20, 2025). The court now refers to plaintiff by the feminine pronouns "she" and "her" because plaintiff states in the complaint in this case that she identifies as a transgender woman and uses feminine pronouns.

The complaint asserts numerous civil rights claims arising from events that occurred in late 2022 and early 2023. As explained below, several of these claims are patently untimely because they are based on events that occurred more than two years before the filing of Allen's complaint. Because these claims cover the first 65 pages of Allen's 142-page complaint, the court will not summarize these claims in the interest of judicial economy.

According to the complaint,[2] Allen was incarcerated in SCI-Camp Hill's restricted housing unit ("RHU") on January 3, 2023. (*Id.* at 65). defendant Voorstad, a doctor in the prison, came to the RHU and stated that he needed to assess Allen's abdominal pain. (*Id.*) Defendants Ressler and John Doe 1 then purportedly strip-searched Allen, handcuffed her, and transported her to a medical cell. (*Id.*)

Voorstad began examining Allen in the medical cell. (*Id.*) Defendants Ressler and John Does 1-6 were present in the room. (*Id.*) Voorstad instructed Allen to lie on the bed in the cell and "rubbed and ran his hand all over [Allen's] abdomen." (*Id.* at 66). Voorstad purportedly stated that he

---

[2] The complaint contains numerous allegations of hundreds of defendants taking mundane actions such as, for example, filing information in electronic logging systems, responding to grievances and related appeals, and walking through cell blocks without doing or saying anything else. In the interest of judicial economy, the court summarizes these allegations only when they are pertinent to Allen's claims.

would order H-Pylori, stool, and thyroid tests for Allen. (*Id.*) Allen told Voorstad that she had regular constipation and that her intestines were "full of feces" sometime in July 2022. (*Id.*) John Doe 1 then stated, "yeah, he's full of shit." (*Id.*)

At this point, Voorstad purportedly stated that he would perform a rectal examination on Allen. (*Id.*) He directed her to lie down on her left side, facing the wall, with handcuffs on. (*Id.*) Voorstad then allegedly pulled down her underwear and exposed her buttocks. (*Id.*) Allen asked if she could be turned so that her buttocks were facing away from the other people in the room, but Voorstad said this could not be done because he could perform the examination better with his right hand. (*Id.*) Allen asked if the officers could leave the room, but they instructed her that at least one had to remain in the room. (*Id.*) John Doe 1 stayed in the room, and the others exited, though defendant Ressler remained just outside the cell. (*Id.*)

Voorstad allegedly placed his hand on Allen's hip and held her down before allegedly placing his finger in Allen's anus. (*Id.* at 66-67). Voorstad then allegedly "cupped his fingers together and slid his entire right hand into the plaintiff's anus, very fast and violently, holding it there with the same initial force" he had used to put his finger in her anus. (*Id.* at 67). Voorstad purportedly "moved his fingers around" and "turned them into a fist" inside

Allen's anus. (*Id.*) Allen purportedly wanted to scream and cry because of the pain and tried to fight back against Voorstad's touch but could not because she was handcuffed and facing the wall. (*Id.*) John Doe 1 purportedly observed this and called John Doe 2 over to look into the cell as Voorstad's entire right hand was inside Allen's anus. (*Id.*) At that point, Voorstad removed his hand from Allen's anus, which allegedly caused a large amount of lubrication to "pour[] out all over the plaintiff's buttocks, the medical bed, and on the floor." (*Id.*) John Doe 2 allegedly laughed and said, "what the fuck, man." (*Id.*) Voorstad allegedly handed Allen six paper towels and told her to wipe herself. (*Id.*) The complaint asserts that Voorstad's actions constituted sexual assault and that defendants Ressler and John Does 1 and 2 failed to intervene to prevent the assault. (*Id.*) Ressler and John Doe escorted Allen back to her cell. (*Id.* at 68). At that point, she attempted to wipe herself off with a towel, but the wiping caused significant pain. (*Id.*) Allen continued to experience significant pain and felt like she could not sit down. (*Id.*) She also allegedly felt "drafts … up her anus." (*Id.*)

At approximately 4:00 PM on the day of the alleged assault, Allen was escorted to the prison's medical dispensary. (*Id.*) Allen asked defendants Stepanski and Billow, two nurses in the dispensary, whether Voorstad had followed the correct procedures for a rectal exam. Stepanski and Billow

purportedly "appeared appalled" and told her he had not. (*Id.*) Stepanski and Billow allegedly began making phone calls to inform others of Allen's allegations of sexual assault. (*Id.* at 70). Allen began "uncontrollably crying." (*Id.*) Defendant Duggan, a correctional officer, instructed Allen to remove her clothing and placed the clothing in a Zip-loc evidence bag. (*Id.*)

Allen was transported to the emergency room at an outside hospital at approximately 5:31 PM. (*Id.*) At the emergency room, Allen was placed in a wheelchair and taken to an examination room where a CAT scan and blood work were performed on her. (*Id.*) Two nurses performed a rape kit examination on her. (*Id.* at 71). The nurses concluded that there were lacerations, abrasions, and redness present on Allen's anus that were consistent with a sexual assault. (*Id.*) The nurses prescribed her Tylenol, stated that the wounds would heal on their own in a week, and instructed her to wait "a while" before attempting to defecate. (*Id.*) Allen asked the nurses and the doctor who were present in the room what the correct procedure was for a rectal examination, and they purportedly stated, "just a finger or two." (*Id.*) Allen again began to cry. (*Id.*) The doctor purportedly concluded that she had been sexually assaulted. (*Id.*)

Defendants Carey and Gooley, officers with the Pennsylvania State Police ("PSP"), interviewed Allen at the hospital and collected the rape kit as

evidence. (*Id.*) Defendant Highhouse, another officer with the PSP allegedly examined the rape kit between 2:00 AM and 5:00 AM. (*Id.*) Allen was transported back from the hospital, where defendant Voorstad allegedly placed her under 23-hour observation in retaliation for complaining about his conduct. (*Id.* at 72). Voorstad also purportedly contacted the hospital and asked if detailed medical records could be released. (*Id.*) Defendant Bartrow, a correctional officer in the prison, placed Allen in a psychiatric observation cell in accordance with Voorstad's orders. (*Id.*) After she was placed in the cell, Voorstad purportedly entered the "Sapphire System" and manipulated Allen's medical records. (*Id.*)

Officers in the housing block where Allen was housed purportedly denied her pain medications, a blanket, and medical follow-up. (*Id.*) They also purportedly "slammed" the door of the unit at all hours of the night to keep Allen from sleeping. (*Id.*) Defendant Cirri purportedly falsified information indicating that she had seen Allen for medical care during this period. (*Id.*) Allen requested pain medications and a "coolant for her rectum and anus" from defendant Bogue, but Bogue allegedly denied the request. (*Id.*)

At approximately 2:00 PM on January 4, 2023, defendants Harrell and Cirri, two nurses in the prison, came to Allen's cell. (*Id.* at 73). Allen began

to tell them what Voorstad had done, but a John Doe officer interrupted the conversation. (*Id.*) Allen told him to mind his own business. (*Id.*) Allen then finished telling Harrell and Cirri what happened, at which point Harrell and Cirri went into another room. (*Id.*) Defendants Fultz, Timpe, and John Doe 3 arrived in the housing block, at which point Allen overheard Fultz telling Harrell and Cirri to "not give that motherfucker Allen shit." (*Id.*) Allen then yelled that they were planning to retaliate against her. (*Id.*)

At approximately 3:00 AM on January 5, 2023, John Does 16 and 17 purportedly came to Allen's cell, impersonated "PREA lieutenants,"[3] and asked Allen various questions about the alleged assault. (*Id.*) At approximately 7:00 PM that night, defendants Kaser, Swearingen, and multiple John Doe correctional officers escorted Allen away from the observation cell and back to the RHU, where they strip-searched her and placed her in a "suicide camera cell." (*Id.* at 74).

Allen's cell in the RHU purportedly had feces on the wall, no heat, and continuous cold air blowing through the vents. (*Id.*) Officers purportedly did not give Allen any extra clothing or blankets for the cold. (*Id.*) It was allegedly

---

[3] The court takes judicial notice that "PREA" refers to the "Prison Rape Elimination Act," a statute that, *inter alia*, sets rules and standards for prison investigations into allegations of sexual misconduct by prison officials.

so cold in the cell that Allen could see her breath. (*Id.*) She was also allegedly unable to flush the toilet in her cell, which led to the continuous smell of feces in the cell. (*Id.*) Allen purportedly remained in this cell until January 10, 2023. (*Id.*) Allen allegedly saw defendants Vega and Swearingen throw away her outgoing mail during this period. (*Id.*) Allen asked defendant Barnes whether the cold temperatures in the cell could be fixed on January 10, 2023, and Barnes purportedly stated that a work order had been placed. (*Id.*)

John Doe 2 moved Allen to another cell on January 10, 2023, after defendant Schneck asked other prison officials if Allen could be moved. (*Id.* at 75). The other cell, however, also had feces on the wall and trash and dirt on the floor and was very cold. (*Id.*) Shortly after her placement in this cell, she was escorted back to the medical department to recover some of her belongings that were there. (*Id.*) Her mail had purportedly been sitting in the "wicket" of her old cell since January 4, 2023, but the officers escorting her did not allow her to get the mail. (*Id.*) Instead, defendant Swearingen brought the mail to her at approximately 5:58 PM that day. (*Id.*) The mail included a response to one of her grievances, which was dated January 4, 2023. (*Id.*) The complaint alleges that this date was placed on the response fraudulently and that the response was not actually written on that date. (*Id.*)

On January 11, 2023, Allen asked defendants Timpe, Fultz, Campaign, Jones, Arentz, Miller, and John Does 2 and 12 if they could help her with the cold temperatures in the cell, but they allegedly ignored or denied her requests for help. (*Id.* at 76-77). On January 12, 2023, defendants Smith and John Doe 3 allegedly denied Allen a breakfast tray, a shower, and yard time. (*Id.* at 78). Allen called for Fultz's help, but Fultz purportedly ignored her. (*Id.*) The complaint states that Allen was "convinced" that she was being denied "heat, law library, food, sleep, exercise (yard), healthcare (medical and mental), and showers for retaliatory, personal vendetta, hateful, racist and sexist reasons." (*Id.*) Later that day, officers deliver Allen's lunch but failed to give her a "bread bag with condiments." (*Id.*) Allen then purportedly heard Smith say to John Doe 12, "oh you mean chicks with dicks over there in 12," referring to Allen. (*Id.*) The complaint alleges that around this time, defendants Duggan, Kaser, and Swearingen denied Allen grievance forms. (*Id.* at 80). Allen, however, was "eventually" able to file a grievance. (*Id.*)

On January 13, 2023, unnamed officers in the RHU purportedly turned on the exhaust fan in the unit, which made it significantly colder. (*Id.*) Allen asked defendants Vito, Timpe, Fultz, Miller, Masiti, Williams, and John Doe 38 to turn off the fan and turn up the heat, but they allegedly ignored her or failed to remedy the situation. (*Id.* at 80-81). On the same day, John Doe 3

10

purportedly gave Allen a lunch tray with soy ingredients, despite her being on a no-soy diet. (*Id.* at 81). The exhaust fan was turned off at approximately 11:00 AM. (*Id.*) The heat was then turned on at 2:15 PM. (*Id.*)

Defendant Rutherford purportedly came to Allen's cell for a medical sick call at approximately 3:35 PM on January 13, 2023. (*Id.*) Rutherford noticed that Allen's feet were very cold and stated that he would approve an extra blanket for her, but did not provide foot warmers, thermal socks, or "diabetic/soft" shoes. (*Id.*) Defendant Antwi and John Doe 28 purportedly denied Allen paid medication later that day. (*Id.*) John Doe 28 also allegedly denied Allen a blanket, foot warmers, or thermal socks. (*Id.* at 82). On January 13, 2023, unnamed officers in the RHU again turned off the heat and turned on the exhaust fan. (*Id.*)

On January 16, 2023, John Does 9-11 strip searched Allen and then escorted her out of her RHU cell and in the prison's security office. (*Id.*) While in the office, defendants Forcey and Stepanchik, two officers with the PSP, interviewed Allen pursuant to their investigation of the alleged sexual assault by Voorstad. (*Id.*) During the interview, Forcey purportedly threatened Allen that she would be criminally charged if it was determined that she was lying about her allegations against Voorstad. (*Id.*)

11

On January 18, 2023, defendants Harrell and Gordon, two nurses in the prison, provided follow-up care for Allen's injuries suffered in the alleged assault. (*Id.*) Allen purportedly learned during this time that officers were recording all of her movements in the prison on handheld cameras, which they purportedly were not doing for any other inmates. (*Id.* at 84-85). On January 22, 2023, and January 23, 2023, defendants Duggan, Kaser, Eaton, Swearingen, Vega, Kithcart, and other unnamed officers purportedly destroyed 24 pieces of Allen's outgoing mail. (*Id.* at 85). The complaint additionally alleges that between December 27, 2022, and February 15, 2023, Allen was only allowed to use the prison law library twice. (*Id.* at 86).

On January 25, 2023, defendant Henderson purportedly issued misconduct charges against Allen for refusal to obey an order. (*Id.* at 89). After conducting a hearing on the misconduct charges, defendant Schneck found Allen not guilty of the charges. (*Id.*)

On January 27, 2023, defendants Henderson and Hunter purportedly put "red cleaner solution" in Allen's food. (*Id.*) Allen allegedly felt sick after consuming the meal. (*Id.* at 89-90). Defendants Henderson and Kithcart then purportedly gave her a dull, used razor later that day. (*Id.* at 90). After using the razor, Allen developed "large ingrown hairs and razor bumps" which became infected and caused significant pain. (*Id.*)

12

On February 1, 2023, defendants Campaign and Timpe purportedly denied Allen a bread bag with one of her meals. (*Id.*) On February 2, 2023, several defendants allegedly arranged to have another inmate, "Triz," placed in a cell directly across the hall from Allen's cell to "harass and intimidate" her. (*Id.* at 91). Triz and other inmates purportedly began verbally harassing Allen immediately. (*Id.* at 92). Defendants Vito and Yox allegedly denied Allen another bread bag on February 5, 2023. (*Id.*) Vito allegedly called Allen a "rat and snitch," and stated that she would be placed in disciplinary custody. (*Id.*) Vito then filed misconduct charges against Allen for threatening a staff member. (*Id.* at 93). In the charges, Vito stated that after Allen asked for her bread bag, she stated, "fuck you pussy, I'll max out, find you in the streets." (*Id.*) The complaint alleges that these allegations were false. (*Id.*)

On February 13, 2023, defendants Zimmerman and John Doe 19 came to Allen's cell, strip searched her, and then handcuffed her to escort her to the prison's shower facilities. (*Id.* at 93-94). However, defendants subsequently denied her a shower. (*Id.* at 94). On February 15, 2023, defendants Zimmerman and John Does 34 and 42 purportedly destroyed three pens from Allen's cell. (*Id.* at 96). Later that day, John Doe allegedly called Allen a racial slur after escorting to a room for a call with an attorney. (*Id.* at 97). Later that day, defendant Miller, a unit manager in the prison,

13

asked Allen if she wanted to be transferred back to general population. (*Id.* at 98). Allen agreed and was transferred several hours later. (*Id.*)

On February 17, 2023, Allen passed two other inmates on a walkway, one of whom stated that he knew Allen "dropped the slip" on his cellmate, which Allen interpreted as an accusation that Allen had reported the inmate's misconduct to authorities. (*Id.* at 99). The inmate stated that he had seen "the paperwork," and that it would be "handled," and threatened to kill Allen. (*Id.*) Allen approached John Doe 25 and asked if she could wait there for the other two inmates to leave the area, but John Doe 25 denied her request. (*Id.*) Allen subsequently saw the other two inmates in another area of the prison, and reported her safety concerns to defendants "St. Pierre, Bengham, Chizzler, and Howdyshell." (*Id.* at 100). On February 24, 2023, Allen was transferred from SCI-Camp Hill to SCI-Mahanoy. (*Id.* at 101).

In March 2023, defendant Forcey prepared a search warrant for medical records from the hospital that treated Allen following the alleged sexual assault. (*Id.* at 102). Defendant Hair-Larue, an attorney with the Cumberland County District Attorney's Office, and defendant Delozier, a magisterial district justice in the Cumberland County Court of Common Pleas, approved the warrant. (*Id.*) After serving the warrant and reviewing the medical records, Forcey purportedly concluded that Allen had not

14

suffered any physical injuries during the incident. (*Id.* at 102-03). Forcey subsequently prepared a criminal complaint against Allen for falsely accusing Voorstad, which Hair-Larue approved. (*Id.*) Delozier signed an affidavit of probable cause for the complaint. (*Id.* at 103). Charges were subsequently filed against Allen on April 19, 2023. (*Id.*)

Allen was subsequently transferred back to SCI-Camp Hill in preparation for her criminal case and was placed in the RHU. (*Id.* at 106). On her way to her cell, defendant Marshall purportedly took several legal documents from her that Allen needed to prepare for the criminal case. (*Id.*) Allen's cell in the RHU purportedly had feces, trash, and dirt on the floor and walls and the lights in the housing block were always on. (*Id.*) Officers in the housing block allegedly denied her showers and use of the exercise yard. (*Id.* at 107). On May 14, 2023, Allen was denied breakfast and lunch. (*Id.*)

On May 15, 2023, defendant Delozier conducted a preliminary hearing on Allen's criminal charges, after which he scheduled a trial in the case before a judge on the Cumberland County Court of Common Pleas. (*Id.* at 107-110). When Allen returned to the RHU, correctional staff denied her a meal. (*Id.* at 110-11). Allen alleges that from May 11, 2023, to May 30, 2023, she was only allowed to use the law library twice, and that the law library did not have a working toilet or sink and smelled like feces, urine, and trash. (*Id.*)

15

The complaint alleges that some time in late May 2023, an inmate on the floor above Allen's floor "did a parachute," i.e., flushed a sheet or towel down the toilet in his cell, which purportedly caused a "violent rush" of feces and other material coming out of Allen's toilet and the other toilets on her floor. (*Id.* at 113). Defendants Kaser, Marshall, Henderson, Eaton, Bob, and several John and Jane Does allegedly moved all the inmates off of the floor except for Allen and one other inmate. (*Id.*) Allen remained in her cell until May 30, 2023, when she was transferred back to SCI-Mahanoy. (*Id.* at 114).

Allen's criminal charges proceeded to trial before defendant Guido, a judge on the Cumberland County Court of Common Pleas, from May 3, 2023, to May 8, 2023. (*Id.* at 118). During the trial, Allen purportedly learned that Forcey had only obtained ten pages of her medical records when he sought the records. (*Id.*) The full records—which were obtained by Allen's counsel and placed into evidence during the trial—purportedly established that Allen suffered physical injuries during the alleged assault by Voorstad. (*Id.* at 118-19). At the conclusion of the trial, the jury acquitted Allen of all charges. (*Id.* at 119). The complaint asserts that this acquittal establishes that there was no probable cause for the charges against Allen. (*Id.*)

The complaint asserts the following claims for relief:[4] (1) sexual assault in violation of the Eighth Amendment; (2) assault and battery under Pennsylvania law; (3) placement in the RHU that violated Allen's right to due process under the Fourteenth Amendment; (4) deliberate indifference to a serious medical need in violation of the Eighth Amendment; (5) negligence and medical malpractice in Allen's medical care; (6) negligence by the defendants involved in the alleged sexual assault; (7) cruel and unusual punishment in violation of the Eighth amendment based on the conditions of Allen's confinement; (8) negligence, assault, and battery under Pennsylvania law based on the conditions of Allen's confinement; (9) deliberate indifference, defamation, slander, negligence, invasion of privacy, intrusion upon seclusion, and gender discrimination based on defendants' verbal harassment of Allen and statements indicating that she was a snitch; (10) malicious prosecution, false imprisonment, false arrest, intrusion of privacy, false light invasion of privacy, intrusion upon seclusion, injurious falsehood,

---

[4] Because plaintiff's claims are set out over 19 pages, assert hundreds of individual claims, and contain innumerable subparts, asides, and statements of claims that are not clearly explained, the court limits its summary of plaintiff's claims to the nineteen categories of claims that can reasonably be understood based on the text of the complaint. To the extent any other claims are advanced, they are dismissed for failure to state a claim upon which relief may be granted because Allen has not adequately explained the factual basis of the claims.

abuse of process, defamation, slander, libel, and negligence based on the initiation of criminal charges against Allen for her allegations against Voorstad; (11) cruel and unusual punishment, assault, battery, and negligence based on the placement of cleaning solution in plaintiff's food; (12) denial of Allen's right of access to courts and negligence based on her limited access to the prison law library; (13) deliberate indifference, invasion of privacy, intrusion upon seclusion, and negligence based on defendants allegedly telling other inmates that plaintiff had informed on them; (14) interference with Allen's right to communicate with an attorney; (15) violation of Allen's right to due process during various disciplinary proceedings; (16) retaliation and civil conspiracy; (17) negligent misrepresentation, fraudulent misrepresentation, deceit, fraud, and negligence based on various statements that Allen alleges were false; (18) medical malpractice, negligence, and lack of informed consent against Voorstad; and (19) spoliation of evidence and negligence based on defendants alleged failure to preserve evidence for her claims against Voorstad.[5] (*Id.* at 121-39).

---

[5] Plaintiff additionally asserts various claims based on defendants interfering with her ability to practice her religion, viewing her naked, throwing her shower shoes away, placing her in cells with various cellmates, and interfering with her personal property, (*see id.* at 128-29, 135), but these claims are based on facts that are outside the limitations period and will therefore be dismissed as untimely as explained below.

## II.    DISCUSSION

This court must review a complaint when "a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. §1915A(a). If a complaint fails to state a claim upon which relief may be granted, the court must dismiss the complaint. *Id.* §1915A(b)(1). The court has a similar screening obligation regarding actions filed by prisoners proceeding *in forma pauperis*. *Id.* §1915(e)(2)(B)(ii) ("[T]he court shall dismiss the case at any time if the court determines that . . . the action or appeal . . . fails to state a claim on which relief may be granted.").

In screening legal claims under Sections 1915A(b) and 1915(e)(2)(B), the court applies the standard governing motions to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See, e.g.*, *Coward v. City of Philadelphia*, 546 F. Supp. 3d 331, 333 (E.D. Pa. 2021); *Smith v. Delaware*, 236 F. Supp.3d 882, 886 (D. Del. 2017).

To avoid dismissal under Rule 12(b)(6), a plaintiff must set out "sufficient factual matter" to show that the claim is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct. "[W]here the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679.

When evaluating the plausibility of a complaint, the court accepts as true all factual allegations and all reasonable inferences that can be drawn from those allegations, viewed in the light most favorable to the plaintiff. *Id.* However, the court must not accept legal conclusions as true, and "a formulaic recitation of the elements of a cause of action" will not survive a district court's screening under Section 1915A and 1915(e)(2). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

Courts must liberally construe complaints brought by *pro se* litigants. *Sause v. Bauer*, 585 U.S. 957, 960 (2018). *Pro se* complaints, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

Plaintiff's claims are filed pursuant to 42 U.S.C. §1983. Section 1983 authorizes redress for violations of constitutional rights and provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an

20

> action at law, suit in equity, or other proper proceeding for
> redress . . . .

42 U.S.C. §1983. Thus, to establish a successful claim under Section 1983, a plaintiff must demonstrate that the challenged conduct was committed by a person acting under color of state law and deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Lake v. Arnold*, 112 F.3d 682, 689 (3d Cir. 1997). By its terms, Section 1983 does not create a substantive right, but merely provides a method for vindicating federal rights conferred by the United States Constitution and the federal statutes that it describes. *Baker v. McCollan*, 443 U.S. 137 (1979).

A defendant cannot be liable for a violation of a plaintiff's civil rights unless the defendant was personally involved in the violation. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 289 (3d Cir. 2018). The defendant's personal involvement cannot be based solely on a theory of *respondeat superior*. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Rather, for a supervisor to be liable for the actions of a subordinate, there must be allegations of personal direction or actual knowledge and acquiescence. *Id.*

## A.    Untimely Claims

The court begins its analysis by dismissing several of Allen's claims as untimely. Section 1983 civil rights complaints brought by inmates in

21

Pennsylvania are governed by Pennsylvania's two-year statute of limitations for personal injury actions. *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017). The limitations period begins to run on the date that the plaintiff knew, or should have known, of the injury upon which the claim is based. *Id.* (citing *Sameric Corp. of Del. v. City of Phila.*, 142 F.3d 582, 599 (3d Cir. 1998)). A district court may dismiss a complaint as untimely pursuant to a screening review under 28 U.S.C. §1915(e)(2) and 28 U.S.C. §1915A if the untimeliness is clear from the face of the complaint. *McPherson v. United States,* 392 F. App'x 938, 943 (3d Cir. 2010).

Here, Allen filed her complaint on December 31, 2024.[6] Thus, to be timely, her claims must be based on events that occurred on or after December 31, 2022. Her complaint, however, contains numerous allegations—spanning the first 65 pages of the 142-page complaint—that occurred before that date. Allen has not presented any basis to toll the limitations period for these claims, nor has she shown that the claims are timely under the continuing violations doctrine because her claims are based on numerous discrete events rather than a single continuing pattern of

---

[6] Pursuant to the prisoner mailbox rule, the complaint is deemed filed on the date it was submitted to prison officials for mailing. *See Pabon v. Mahanoy*, 654 F.3d 385, 391 n.8 (3d Cir. 2011)

conduct by the defendants. *See Cowell v. Powell Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (noting that under the continuing violations doctrine, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period"). Accordingly, the court will dismiss the complaint with prejudice as untimely to the extent it asserts claims based on events that occurred prior to December 31, 2022.

**B.    Plainly Meritless Claims**

The court will next dismiss numerous claims in the case that are plainly meritless. Allen's complaint advances hundreds of claims, many of which appear to be based on nothing more than defendants' mere presence, stray remarks made towards her that did not cause her any harm, or trivial and petty annoyances from her life in prison. Having extensively reviewed all 142 pages and 1,755 numbered paragraphs in the complaint under the liberal construction afforded to pro se filings, the court finds that the only claims that warrant extensive analysis are: (1) claims arising from defendant Voorstad's alleged sexual assault; (2) claims relating to the conditions of Allen's confinement; (3) claims arising from alleged tampering with Allen's food; and (4) claims relating to the alleged malicious prosecution during Allen's criminal case. All other claims will be dismissed for failure to state a claim upon which

relief may be granted because Allen has simply failed to allege sufficient facts to state any other claims even on a very liberal construction of her complaint.

### C.    Sexual Assault and Related Claims

Turning next to the claims arising from defendant Voorstad's alleged sexual assault, the court first finds that Allen has adequately stated a claim upon which relief may be granted against Voorstad. Allen alleges that Voorstad anally penetrated her with his entire fist without her consent in the guise of conducting a medical examination. This is clearly sufficient to allege a violation of Allen's civil rights under the Eighth Amendment. *See Ricks v. Shover*, 891 F.3d 468, 475 (3d Cir. 2018) ("[A] single incident of sexual abuse, if sufficiently severe or serious, may violate an inmate's Eighth Amendment rights no less than repetitive abusive conduct." (internal emphasis omitted) (quoting *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015))). The allegations against Voorstad are also plainly sufficient to assert state law claims for assault, battery, negligence, and malpractice based on a lack of informed consent.

No other defendants, however, can be held be liable for Voorstad's alleged sexual assault. Although seven correctional officers were present or nearby during the alleged assault, there is no allegation that the officers were

aware that Voorstad was sexually assaulting Allen. Rather, it appears from the four corners of the complaint that the officers believed Voorstad was conducting a legitimate rectal examination on Allen. Their mere presence during the alleged assault is not sufficient to establish their personal involvement. Similarly, numerous defendants are named in the complaint based on their failure to adequately respond to Allen's complaints and grievances about the alleged assault, but a defendant's after-the-fact response to a grievance or complaint about an event is not sufficient to establish the defendant's personal involvement. *Dooley v. Wetzel*, 957 F.3d 366, 375 (3d Cir. 2020). Thus, the case will be allowed to proceed against defendant Voorstad, but the claims against all other defendants arising from Voorstad's alleged assault will be dismissed.

### D.    Conditions of Confinement Claims

To state a claim for violation of a plaintiff's rights based on the conditions of her confinement, a plaintiff must allege that: (1) she was incarcerated under conditions posing a substantial risk of serious harm; (2) the defendants were deliberately indifferent to that risk; and (3) the defendants' deliberate indifference caused her harm. *Williams v. Sec'y Pa. Dep't of Corrs.*, 117 F.4th 503, 514 n.58 (3d Cir. 2024).

25

Allen's conditions of confinement claim is based on cold temperatures on her housing block, the denial of several other meals, malfunctioning toilets, and several other conditions. These conditions, either alone or in combination, are not sufficient to state a claim upon which relief may be granted. To begin, although exposure to cold temperature may be the basis for a deliberate indifference claim when prison officials fail to take sufficient measures to ensure the prisoner's protection from the cold, *see, e.g.*, *Mamanna v. Fed. Bureau of Prisons*, 934 F.3d 368, 373 (3d Cir. 2019) (citing *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)), the claim may only proceed if the conditions were extreme or the plaintiff suffered—or was likely to suffer—significant harm. *See, e.g.*, *Bracey v. Sec'y Pa. Dep't of Corrs.*, 686 F. App'x 130, 136 (3d Cir. 2017); *Freeman v. Miller*, 615 F. App'x 72, 79 (3d Cir. 2015). Here, the complaint alleges that Allen endured cold temperatures for over a week in the RHU, but it does not appear from the complaint that these conditions were particularly extreme, and it is not alleged that Allen suffered any risk of harm from the cold. Similarly, there is no allegation in the complaint that the conditions posed by the malfunctioning toilets in the prison posed any risk of harm to Allen's health or safety other than having to deal with the obviously unpleasant smell of feces and urine.

26

The denial of meals violates the Eighth Amendment only when a substantial number of meals has been denied. *Washington v. Rozich*, 734 F. App'x 798, 801 (3d Cir. 2018); *Lindsey v. O'Connor*, 327 F. App'x 319, 321 (3d Cir. 2009). Here, Allen alleges she was denied a handful of meals over several months. This sporadic denial of meals is not substantial enough to violate the Eighth Amendment. *See Washington*, 734 F. App'x at 801. Finally, all other conditions of confinement alleged in Allen's complaint appear to be nothing more than trivial annoyances with her confinement. Thus, because the conditions of confinement alleged simply do not violate the Eighth Amendment, Allen's conditions of confinement claim will be dismissed.

### E.    Food Tampering

The court next considers Allen's claim that defendants Hunter and Henderson violated her civil rights by putting "red cleaner solution" in her "dinner pasta (red sauce)." (*See* Doc. 1 at 89-90). This claim does not set out "sufficient factual matter" to state a claim upon which relief may be granted. *Iqbal*, 556 U.S. at 678. Allen has not alleged any facts to show that she had personal knowledge that defendants poisoned her food, nor has she alleged that she or anybody else saw the defendants place a foreign substance in the food. Rather, it appears from the complaint that Allen simply ate a meal and felt sick and then speculated that it must have been poisoned.

This unsupported speculation is not sufficient to "nudge" the claim "across the line from conceivable to plausible." *Id.* at 680.

### F.   Malicious Prosecution and Related Claims

Finally, the court considers Allen's claims that Forcey, Hair-Larue, and others wrongfully initiated a criminal prosecution against her. These claims sound in malicious prosecution, false arrest, and false imprisonment.[7]

To state a claim for malicious prosecution under Pennsylvania law, a plaintiff must allege: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; and (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice. *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 791 (3d Cir. 2000). Claims for malicious prosecution, false arrest, and false imprisonment all require the absence of probable cause. *See, e.g.*, *McNeil v. City of Easton*, 694 F. Supp. 2d 375, 399 (E.D. Pa. 2010). The plaintiff's acquittal on the underlying criminal charges is not by itself sufficient to establish the absence of probable cause

---

[7] Allen also asserts claims for intrusion of privacy, false light invasion of privacy, intrusion upon seclusion, injurious falsehood, abuse of process, defamation, slander, libel, and negligence arising from her criminal case, but these claims will be dismissed for failure to state a claim because Allen has not sufficiently explained the factual basis for the claims in her complaint.

28

for the charges. *Fleck v. Trs. of Univ. of Pa.*, 995 F. Supp. 2d 390, 409 (E.D. Pa. 2014) (citing *Turano v. Hunt*, 631 A.2d 822, 824 (Pa. Commw. Ct. 1993)).

Here, the only basis Allen has alleged for the absence of probable cause is that she was eventually found not guilty of the underlying criminal charges. (*See* Doc. 1 at 119). This is not sufficient to show the absence of probable cause. *Fleck*, 995 F. Supp. 2d at 409. Moreover, it appears from the complaint that defendants *did* have probable cause to initiate the criminal charges. It is alleged that Forcey initiated the criminal charges against Allen after reviewing her medical records and concluding that she had not suffered any physical injuries. (*See* Doc. 1 at 102-03). It is then alleged, however, that during the trial, it became clear that Forcey had erroneously only obtained the first ten pages of the medical records and that the remainder of the medical records established that Allen actually did suffer physical injuries. *See id.* at 118-19. There is no allegation that Forcey intentionally or knowingly reviewed incomplete medical records; rather, it appears that he obtained incomplete medical records because of an error made by the hospital.[8]

---

[8] The complaint asserts in conclusory fashion that Forcey obtained the records "knowingly," but this conclusory assertion is not entitled to the assumption of truth. (*See id.* at 118).

Furthermore, there is no allegation that Forcey, Hair-Larue, or anybody else involved in initiating criminal charges did so with malice or for any improper purpose. It appears from the complaint that Forcey and Hair-Larue were simply acting in their professional capacities as an officer with the PSP and an attorney with the DA's office in investigating whether to file criminal charges against Allen. There are no facts alleged as to why these individuals would have any motive to file improper criminal charges against Allen. It does not appear that either individual had any personal relationship with Allen or personal knowledge of her prior to their investigation.

Thus, because it appears that Forcey and Hair-Larue had probable cause to initiate criminal charges against Allen and because there is no allegation of malice or any improper purpose, the claims for malicious prosecution, false arrest, and false imprisonment will all be dismissed.

### G.    Leave to Amend Will Be Denied

Before dismissing a civil rights claim for failure to state a claim, a district court must permit a curative amendment unless the amendment would be inequitable or futile. *Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008). The court will deny leave to amend as futile in the instant case. Allen's current complaint is 142 pages and 1,755 numbered paragraphs long, and includes seemingly every interaction she has had with any of the

over 200 named defendants she had during the relevant period. In light of Allen's extensive recollection of the events giving rise to the complaint, the court finds it highly unlikely that there are any additional facts that could cure the pleading defects the court has identified that have not already been included in the complaint.

## III.    CONCLUSION

For the foregoing reasons, the court will dismiss with prejudice all claims in this case except plaintiff's sexual assault, assault, battery, negligence, and malpractice claims against defendant Voorstad. All other defendants will be terminated from the case. Plaintiff's "motion to proceed to case" will be denied as moot. An appropriate order shall issue.

*s/ Malachy E. Mannion*
**Malachy E. Mannion**
**United States District Judge**

**Dated: August  26, 2025**
25-106-01

31